UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL NO. 07-157 (HHK) |
| | : | |
| v. | : | |
| | : | |
| **ANTOINE BLALOCK** | : | |
| | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

### I.  BACKGROUND

Antoine Blalock appears before this Court to be sentenced pursuant to his plea of guilty to one count of Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g). The facts underlying this offense, which the defendant reviewed with his attorney and acknowledged by signing the statement, "I fully understand this proffer and I acknowledge its truthfulness, agree to it and accept it without reservation," are as follows:

On May 21, 2007, at about 9:45 am, Antoine Blalock stopped his Chevrolet Monte Carlo, bearing Maryland tags LFZ308, outside of the Metropolitan Police Department's Seventh District Station located at 2455 Alabama Avenue S.E., in Washington, DC. Witnesses observed him get out of the vehicle and walk around and open its trunk.

From inside of the trunk, the defendant pulled out a black bag. Moments later, he began shooting a gun into the air. As he did so, a witness heard him stating "the police should leave us alone and let us sell our weed."

Several MPD officers heard the shots from within the station and quickly went outside in response. Officer Anthony Allen approached the defendant with his weapon drawn and ordered the defendant to put down his gun. The defendant did so, and then proceeded to remove all of his clothes. He was apprehended without further incident, and was placed under arrest. Upon his arrest, officers recovered a .380 caliber Bersa semi-automatic handgun and five shell casings from the area around his feet.

Officers also recovered, from amidst the defendant's belongings that were scattered on the ground at the foot of his trunk, 23 individually packaged ziplocks of marijuana and an additional sandwich bag of marijuana. These items, which were tested by the DEA and found to be 44.1 grams of marijuana, were packaged in a manner and found in an amount that was consistent with the way marijuana is distributed in the District of Columbia.

Upon his arrest, the defendant stated that his purpose in driving to the police station was to win recognition for his label. He also stated that he wished he'd had two more bullets (the magazine had a larger capacity than the number of shell casings found).

A review of Mr. Blalock's record established that he was convicted on Felony Assault on May 31, 2000, in Maryland case number CT991934A, a crime for which he received a nine-year sentence.

## II.   SENTENCING CALCULATION

### A.   Statutory Maximums

Pursuant to 18 U.S.C. § 924(a)(2), a violation of 18 U.S.C. § 922(g) carries a maximum statutory penalty of 10 years of imprisonment, a fine of $250,000 pursuant to 18 U.S.C. § 3571(d),

and an obligation to pay any applicable interest or penalties on fines not timely made and a term of up to three years of of supervised release, according to 18 U.S.C. § 3583(b)(2).

  B. <u>Sentencing Guidelines Calculation</u>

  The Guideline calculation in the Presentence Report places the defendant's base offense level at 20. <u>See</u> PSR ¶16, U.S.S.G. §2K2.1(a)(4)(A). The presentence report writer concluded that the defendant warranted a four-point increase in his guideline level because he possessed a gun in connection with another crime – specifically his possession with the intent to distribute marijuana. <u>See</u> PSR ¶ 17, U.S.S.G. §§ 2K2.1(b)(6). The defendant benefits from a three-level adjustment for acceptance of responsibility by virtue of his plea. His total offense level is thus calculated at 21. <u>See</u> PSR ¶ 24. The PSR calculates the defendant's criminal history score as nine. <u>See</u> PSR ¶¶ 29-31. The Guideline range for the defendant is therefore calculated at 57 to 71 months of imprisonment. <u>See</u> PSR ¶ 58.

**III.** **<u>GOVERNMENT'S RECOMMENDATIONS</u>**

  For the reasons set forth below, the government respectfully recommends that the Court sentence the defendant to the low end of the applicable Guideline range – specifically, 57 months of imprisonment. This sentence satisfies the requirements set forth in Title 18, United States Code, Section 3553(a).

  A. <u>Acceptance of Responsibility</u>

  The defendant has accepted responsibility for his conduct by means of his timely plea in this case.

B.   Application of the Federal Guidelines post-*Booker*

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756.

Nonetheless, and as the Supreme Court stated as recently this past December, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, ____ U.S. ____, 2007 WL 4292116, at *7 (December 10, 2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The district court should then consider all of the applicable factors set forth in Title 18 United States Code, Section 3553(a). See id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); and the need to avoid unwarranted sentence disparities (18 U.S.C. § 3553(a)(6)).

The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. See United States v. Rita, ___ U.S. ___, 127 S.Ct. 2456 (2007). The Guidelines represent the distillation of two decades of

careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). And the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766-67 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be based on the offender's actual conduct and history, and that sentenced be uniform across the country, to the extent possible. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress'

basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.")

The Guidelines thus seek to implement – in a fair and uniform way – the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in Gall. See Gall, at * 7. It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the district court. In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for Guideline sentencing.

    C.    The Guideline Calculation in the PSR Is Correct

The defendant contends that the PSR incorrectly calculates his guideline range because it includes a four-level enhancement under U.S.S.G. § 2K2.1(b)(6) for possessing a weapon in connection with another felony offense – specifically in connection with his possession with the intent to distribute marijuana. (See Defendant's Memo in Aid of Sentencing at 2.) The defendant does not quibble with the fact that he possessed the 23 individually packaged ziplocks of marijuana and an additional sandwich bag of marijuana found strewn at his feet. (Id. at 3.) Instead he asserts that he lacked the specific intent to distribute the marijuana because of the "confused, angry, frustrated, agitated, and hostile" state that he was in when he was admitted to Greater Southeast Hospital shortly after his arrest. (Id. at 2.)

Although the defendant does not directly state this in his memorandum in aid of sentencing, he was diagnosed as being under the influence of PCP while at Greater Southeast Hospital after he was arrested in this case on May 21, 2007.  See PSR ¶ 43.  And while voluntary intoxication is not a defense to a general intent crime, it can, in certain instances, provide a defense to a specific intent crime.  See Heideman v. United States, 259 F.2d 943, 946 (D.C. 1973); see also United States v. Childress, 58 F.3d 693, 706-09 (D.C. Cir. 1995); United States v. Veach, 455 F.3d 628 (6th Cir. 2006) (voluntary intoxication "may preclude the formation of specific intent and thus serve to negate an essential element of certain crimes").

Here, the issue the court must determine is whether the defendant's PCP intoxication rendered him unable to form the requisite intent to distribute the marijuana he possessed in connection with the weapon.  Several facts in the record establish that the defendant was not so incapacitated by his PCP intoxication as to render him unable to form the requisite intent to distribute the marijuana he possessed.

First and foremost, as he was shooting his weapon into the air, a witness heard him stating "the police should leave us alone and let us sell our weed."[1]  Additionally, the defendant himself was coherent enough to follow police commands to put down his weapon.  He was calculating enough to claim that he wished he had two more bullets left when confronted with two responding officers.  And he was crafty enough to form an explanation for the fact that he stripped naked, saying that he did so in order to show the police that he had no more weapons.

---

[1]   It would be absurd to suggest that the defendant possessed sufficient clarity of thought to permit him able to conduct a (misguided) protest against what he perceived to be overly restrictive police action prohibiting the sale of marijuana (thereby winning recognition for his "label") at the same time he was so incapacitated as to be unable to form the requisite intent to sell it himself.

Whether the defendant's voluntary intoxication was sufficient to render him incapacitated to the point that he was unable to form the requisite intent is a question of degree. The government does not dispute that the defendant was intoxicated; but his level of intoxication did not incapacitate him to the degree that he was unable to form the requisite intent. Here, the defendant's own words and actions indicate that he did in fact possess marijuana with the intent to distribute it; and that the defendant's own conduct was intended to be a protest against the police whom he perceived to be thwarting his attempts to do so.

    D.    The Defendant's Conduct Underlying this Offense Fully Justifies a 57-Month Sentence.

The Government respectfully asks this court to sentence the defendant to a sentence at the low end of the applicable guideline range, specifically a sentence of 57 months of incarceration.

The defendant has a significant history of arrests and convictions, including at least two crimes that involved serious risk to the victims. In one, a 1999 1st Degree Assault case, the defendant and his co-defendant fired shots at two victims from a moving vehicle. In the second, a 2003 "Eluding" case, the defendant fled from authorities -- almost running over a police officer in the process, and ultimately running into a parked police car -- with three children sitting unrestrained in the backseat. The behavior exhibited by the defendant in both cases is dangerous and erratic.

In this case, the defendant opened fire in the middle of the day in the middle of a busy street while high on PCP. The defendant's stated rationales for his behavior run the gamut from trying to win recognition for his label to protesting police acts prohibiting the sale of drugs. Although the defendant has plead guilty only to possessing the weapon during this episode, in fact he discharged

it – which is a far more serious crime. His actions represent a danger to the community and should be treated seriously.

IV.   CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 57 months of imprisonment.

                                        Respectfully submitted,

                                        JEFFERY A . TAYLOR
                                        United States Attorney
                                        Bar No. 498610


                                        /s/
_____
                                        JOCELYN S. BALLANTINE
                                        Assistant United States Attorney
                                        Federal Major Crimes Section
                                        California Bar No. 208-267
                                        555 4th Street, N.W.
                                        Washington, DC 20001
                                        Phone: 514-8203
                                        Fax: 514-6010